

FILED
JAN 16 2026
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ANDREW EBERST | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:26-CV-24-BO |
| | ) | |
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
| Defendant. | ) | |
| | ) | |

COMPLAINT FOR DECLARATORY, INJUNCTIVE, COMPENSATORY, RULE 37(e)
AND OTHER RELIEF

---

## I. JURISDICTION, VENUE, AND EXHAUSTION

### A. Subject Matter Jurisdiction

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706; the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Privacy Act of 1974, 5 U.S.C. § 552a; the Freedom of Information Act (FOIA), 5 U.S.C. § 552; and the First and Fifth Amendments to the U.S. Constitution.

1

2. Sovereign immunity is waived for claims against federal agencies seeking non-monetary relief under the APA, 5 U.S.C. § 702; for access, amendment, and damages claims under the Privacy Act, 5 U.S.C. § 552a(g); and for FOIA disclosure claims, 5 U.S.C. § 552(a)(4)(B). Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202.

3. To the extent Plaintiff seeks compensatory damages under the Privacy Act or Section 504 of the Rehabilitation Act, such relief is available under 5 U.S.C. § 552a(g)(4) and 29 U.S.C. § 794a(a)(2), where the EEOC has accepted federal financial assistance as a recipient through inter-agency funding mechanisms administered outside the annual appropriations process, including the Technology Modernization Fund.

**B. Venue**

4. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of North Carolina. Plaintiff resides in Wayne County, North Carolina, and the relevant administrative interactions, including submission of accommodation requests, receipt or non-receipt of responses, and denial of adjudicatory access occurred while Plaintiff was located in this District.

5. Venue is further proper under 28 U.S.C. § 1391(e)(1)(C), as Plaintiff resides in this District. Assignment to the Western Division is appropriate under Local Civil Rule 1.1.

**C. Exhaustion of Administrative Remedies**

6. Plaintiff has satisfied all applicable exhaustion requirements, and to the extent any remain, further exhaustion is excused as futile under McCarthy v. Madigan, 503 U.S. 140, 148 (1992).

7. Section 504 of the Rehabilitation Act does not require administrative exhaustion. See Resnick v. Penza, 693 F. Supp. 296, 299 (D. Conn. 1988). Nevertheless, Plaintiff pursued

2

multiple good-faith efforts at exhaustion between May and September 2025, including: (a) reasonable accommodation requests to five EEOC divisions; (b) an appeal to the Office of Federal Operations; (c) a formal Section 504 complaint to the Office for Civil Rights; (d) FOIA filings and appeals; (e) a complaint to the Office of Inspector General; and (f) direct escalations to senior EEOC officials and congressional staff.

8.     These efforts were met with non-response, obstruction, or procedural collapse. Remand would only compound the denial of access already alleged.

**D. Jurisdictional Scope of Relief**

9.     Plaintiff seeks declaratory, injunctive, and equitable relief under the APA, the Rehabilitation Act, the Privacy Act, FOIA, and the Constitution. Claims for actual damages are limited to those authorized under 5 U.S.C. § 552a(g)(4) (Privacy Act) and 29 U.S.C. § 794(a), where applicable.

10.     Plaintiff does not seek judicial review of any benefits determination or entitlement decision. Rather, Plaintiff challenges the agency's failure to perform ministerial duties required by regulation, including the mandatory initial assessment and development of a rehabilitation plan. These duties are nondiscretionary and must be completed before any lawful referral or denial may occur. The absence of these procedural steps resulted in the denial of access to federally supported employment pathways and constitutes an actionable failure to act under 5 U.S.C. § 706(1).

11.     Plaintiff expressly preserves all arguments challenging statutory limitations on relief, including under *Lane v. Peña*, 518 U.S. 187 (1996); *FAA v. Cooper*, 566 U.S. 284 (2012); and *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2278 (2024), for appellate and Supreme Court review.

## II. PARTIES

3

12. Plaintiff, Andrew J. Eberst, is an individual residing in Wayne County, North Carolina, within the jurisdiction of this Court. Plaintiff is a veteran and a qualified individual with a disability as defined by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. At all times relevant to this action, Plaintiff has engaged with federal adjudicatory processes, including reasonable accommodation requests, administrative hearings, appeals, and related procedural filings.

13. Defendant United States Equal Employment Opportunity Commission ("EEOC") is an independent federal agency of the United States, established under Title VII of the Civil Rights Act of 1964, with its principal office located in Washington, D.C. The EEOC is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1), the Privacy Act, 5 U.S.C. § 552a(a)(1), and the Freedom of Information Act, 5 U.S.C. § 552(f)(1). The EEOC administers federally conducted civil rights programs, including administrative hearings by Administrative Judges, appellate review by the Office of Federal Operations, civil rights enforcement through the Office of Civil Rights, records and FOIA processing through the Office of Legal Counsel, and related adjudicatory systems that are subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act and its implementing regulations.

## INTRODUCTION

14. This case presents a fundamental question of law and of justice: whether a federal agency may lawfully require exhaustion of an adjudicatory process it has rendered inaccessible through its own systems, practices, and silence. Plaintiff, a service-connected disabled veteran, brings this action not to challenge an adverse decision on the merits, but to contest the denial of adjudication itself. The process through which civil rights are vindicated must be more than formal; it must be functional.

4

15. Plaintiff complied with every procedural requirement across the EEOC's federal EEO framework, including hearings, appeals, record access, and internal oversight, expecting a process grounded in law. Instead, what followed was the quiet inversion of that promise. Filings were submitted through the agency's portal, confirmed with timestamps, then rendered inaccessible, unusable by the Plaintiff, absent from the record, and ignored by adjudicators. Critical pleadings could not be retrieved. Requests for accommodation received no response. Rulings were issued on a record that was never stabilized, never certified. At every turn, the system extended the form of adjudication while withholding its substance, creating an illusion of process that preserved appearances while denying participation.

16. This case is not an isolated technical dispute. It is a systemic failure of the mechanisms designed to enforce statutory and constitutional rights. The EEOC, tasked with enforcing disability discrimination laws and related civil rights mandates, became the principal barrier to their enforcement. Oversight mechanisms that exist to correct defects, including Freedom of Information Act channels, civil rights offices, and independent review bodies, declined to intervene or address the institution-wide breakdown. In doing so, the agency has perfected a method of procedural gamesmanship that operates within the ambiguity of administrative law, preserving the appearance of compliance while exploiting judicial deference traditionally afforded under doctrines such as Chevron, and thereby insulating its conduct from meaningful review. Even internal communications altered core procedural baselines without authorization or explanation.

17. Plaintiff did not speculate about these failures; he documented them as they occurred. He preserved submission logs, captured system behavior on video, issued formal preservation notices, and followed every prescribed path for internal redress. At no point did any agency component correct the record, acknowledge the suppression, or restore access. The harm

5

here is not theoretical. It is procedural exclusion captured in real time and ignored in real time, a denial of adjudication not by rule, but by attrition. A system that accepts filings it will not process, enforces deadlines it will not explain, and dismisses claims without reaching their substance is not a forum of justice. It is an apparatus of denial.

18. This complaint presents a threshold legal question: whether a process that denies participation, suppresses record access, and displaces the rule of law with procedural attrition can satisfy the requirements of the Constitution and federal statutory mandates. In a post Chevron landscape, courts may no longer defer to agency interpretations where statutory rights and procedural guarantees are at stake. It is the duty of the judiciary to assess not only whether agency actions are reasonable, but whether they are lawful.

19. When the agency entrusted with enforcing civil rights becomes the violator of those rights, and when every internal check declines to intervene, the constitutional structure begins to break. When access to justice depends not on law, but on procedural endurance, equal protection ceases to be a guarantee and becomes a test of attrition. This case is not about a single dispute, it is about whether administrative adjudication still functions as a meaningful avenue for vindicating statutory and constitutional rights.

20. This case follows a familiar pattern seen in past federal scandals, where agencies preserved the appearance of compliance while concealing systemic failure. In the Phoenix VA wait-time scandal, data was falsified to hide delays in medical care, resulting in preventable deaths. The IRS targeting controversy exposed how content-based filtering suppressed legitimate applications under the guise of neutrality. At the TSA and FBI, classification systems denied citizens the ability to meaningfully challenge designations that affected their rights, often without

6

notice or recourse. In each case, what appeared to be lawful process concealed a deeper breakdown, a system designed to perform legitimacy while denying accountability.

21.     What this case reveals has come to be known as Adjudigate: a procedural scandal in which federal adjudication retains the outward form of law while structurally denying its function. The conduct at issue is not speculative, it is preserved in contemporaneous evidence, escalated through every internal channel, and now partially admitted by the agency itself. Filings were suppressed, access denied, records manipulated, and decisions issued on incomplete dockets. What emerges is not simply administrative failure, but a repeatable system of exclusion concealed beneath the appearance of adjudication. Adjudigate is not a theory. It is a record.

22.     Plaintiff does not seek special treatment. He seeks the ordinary conditions under which justice can be lawfully pursued. This case is live and calls on the Court to restore those conditions, affirming that access to justice must be real, not illusory.

## IV. STATEMENT OF FACTS

**A. Plaintiff's Disability Status and Reliance on Mandatory Administrative Processes**
*(29 U.S.C. § 794)*

23.     Plaintiff is a 100% service-connected disabled veteran, as verified by the U.S. Department of Veterans Affairs, and is therefore a qualified individual with a disability under Section 504 of the Rehabilitation Act. His condition required reasonable procedural support to ensure meaningful participation in the administrative process.

24.     At all relevant times, Plaintiff was required by federal law to pursue his civil rights claims through the EEOC's federal-sector administrative process as a mandatory prerequisite to

7

judicial review. Participation in that process, including filings, motion practice, and adjudication, was not optional and constituted the exclusive means by which Plaintiff could seek relief.

25. Plaintiff was categorically excluded from all programs, activities, and adjudicatory proceedings within the Commission pertaining to his claims. Despite full procedural compliance, Plaintiff was denied meaningful adjudication at every stage, including intake, investigation, hearing, and appeal. The structural and procedural barriers imposed by the Commission made it impossible for Plaintiff to participate meaningfully in any program or activity for which he was otherwise qualified.

26. Plaintiff's exclusion from the Commission's adjudicatory process was directly caused by the Commission's failure to provide reasonable procedural accommodations required by Section 504. Plaintiff's disability necessitated basic procedural supports to ensure equal access, including confirmation of filings, access to case records, clear notice of procedural status, and timely guidance regarding adjudicatory steps. Plaintiff submitted at least fifteen formal accommodation requests to five separate Commission divisions. The Commission did not respond to those requests and never initiated the interactive process required by law. As a result, Plaintiff was denied meaningful access to the Commission's programs and adjudicatory proceedings and was effectively barred from adjudication on the basis of disability.

**B. Agency Investigation and Creation of the Investigative Record**
*(29 C.F.R. 1614.106(e), 1614.108(a)–(g))*

27. On October 16, 2024, Plaintiff submitted a formal EEO complaint to the Department of Veterans Affairs, thereby triggering the agency's nondiscretionary intake and processing obligations under 29 C.F.R. § 1614.106. (See Exhibit B-1)

8

28.    On October 25, 2024, the agency issued a written acknowledgment confirming receipt of the complaint and stating that it had been referred to the Veterans Benefits Administration ("VBA") for investigation. (See Exhibit B-2)

29.    At the time of this filing, Plaintiff was actively participating in the employment transition phase of an agency-administered program and had applied for a GS-13 federal position within the Department of Veterans Affairs, covered under 29 C.F.R 1614.103. The assigned counselor denied referral to the position without documented justification.

30.    Under 29 C.F.R. § 1614.203(d)(1)(i)(B), federal agencies shall provide individuals with disabilities equal access to employment-related services, including job referral. The EEOC monitors and enforces compliance with this provision. Plaintiff, a qualified individual with a disability, was denied job referral within an agency-administered employment program.

31.    Despite this acknowledgment, the Department of Veterans Affairs failed to initiate the mandatory investigative process required by 29 C.F.R. § 1614.108. No investigator was assigned, no investigative steps were taken, and no Report of Investigation ("ROI") was prepared. The agency later confirmed in its September 2, 2025 filing that no ROI was submitted, stating it deemed the matter "not covered." However, the agency did not issue any formal dismissal or comply with the procedures for declining jurisdiction under 29 C.F.R. § 1614.107. (See Exhibit B-3)

32.    These omissions rendered the acknowledgment procedurally deficient and noncompliant with § 1614.106(e), which uses mandatory "shall" language and requires agencies to either timely investigate or formally dismiss a complaint within prescribed limits.

9

33. The agency further failed to comply with § 1614.108(g), which requires written notice to the complainant when an investigation is not completed within 180 days, including notice of applicable procedural rights. No such notice was issued.

34. More than 180 days elapsed after the filing of the complaint without any investigative activity, record development, or explanation for the agency's inaction.

35. Taken altogether, the Commission failed to initiate any lawful adjudicatory process. No record was developed, no inquiry conducted, and no formal action taken. The complaint was not dismissed, resolved, or investigated; it was left in a state of procedural suspension. Despite Plaintiff's ongoing efforts to supplement the record and request status, no division within the Commission assumed jurisdiction or provided direction. This was not administrative delay. It was systemic nonperformance. The Commission's refusal to process the complaint constituted agency action unlawfully withheld, rendered further exhaustion futile, and denied Plaintiff access to the only forum available for civil rights enforcement.

### C. Hearing Request & Mandatory File Production
*(29 C.F.R. 1614.108(h)( MD-110, Chapter 7)*

36. Pursuant to 29 C.F.R. § 1614.108(f), a complainant may request a hearing if the agency fails to complete the investigation or issue the required notice within 180 days. In this case, the Department of Veterans Affairs failed to produce a Report of Investigation and submitted no request for extension. Plaintiff lawfully exercised his procedural right and submitted a timely Request for a Hearing before the Equal Employment Opportunity Commission.

37. On April 16, 2025, the EEOC issued a Notice of Receipt of Hearing Request, assigned Hearing No. 570-2025-00810X, and formally notified the agency that Plaintiff's hearing request had been accepted for adjudication. (See Exhibit C-1)

10

38. Upon receipt of the hearing request, federal-sector EEO regulations imposed a nondiscretionary obligation on the agency to submit the complete complaint file, including the Report of Investigation, to the EEOC within fifteen days, in compliance with 29 C.F.R. § 1614.108(h).

39. On May 2, 2025, the EEOC's adjudicatory system issued an automated Notice of Intent to Issue Sanctions, ordering the agency to upload the complaint file and justify its noncompliance with 29 C.F.R. § 1614.108(h). The notice confirmed that the agency had failed to submit the Report of Investigation within the required fifteen-day window and had not designated a representative. It further notified the agency that it was now subject to sanctions for failure to follow the regulations. (See Exhibit C-2)

40. Taken together, the agency's refusal to produce the complaint file, its disregard of regulatory deadlines, and its failure to engage after formal notice demonstrate more than isolated error. These failures confirmed that the transition into adjudication never lawfully occurred. This breakdown did not merely delay the hearing; it rendered the adjudicatory phase structurally impossible from the outset, extending the pattern of exclusion already established during the investigative stage.

41. The continuation of this process has revealed a deeper pattern, one in which it would be reasonable to expect that the enforcement body, including the EEOC, would intervene and correct the agency's procedural failures. A complaint that was properly filed, acknowledged, and escalated should have triggered some form of corrective action. Instead, Plaintiff became a witness to a process that demanded full compliance from the complainant, while allowing the agency to decline participation without consequence. At every stage, the burden remained entirely on the complainant. Over time, it became clear that what appeared to be administrative exhaustion

11

was not the exhaustion of agency remedies, but the exhaustion of the individual navigating a system with no enforcement at all. Deference, perfected over decades, has allowed agencies to operate in procedural ambiguity, where structure exists, but obligation does not. (219 days from incident)

### D. Assignment of an Administrative Judge and Adjudicatory Authority
*(29 C.F.R. § 1614.109(a); EEOC AJ Handbook – Venue Assignment)*

42. After Plaintiff invoked the hearing phase, the matter proceeded without the assignment of an Administrative Judge for forty-seven days and remained stalled in Alternative Dispute Resolution, despite Plaintiff's explicit declination and formal request to be removed from ADR. No scheduling order, discovery directive, or case-management instruction was issued during this period. The EEOC's internal adjudicatory protocols contemplate prompt judicial assignment to initiate case oversight, but none occurred. (See Exhibit D-3)

43. On June 2, 2025, after Plaintiff escalated the issue of non-assignment and identified the forty-seven-day delay, the EEOC assigned Supervisory Administrative Judge Danielle Hayot to preside over the matter. Later that same day, Judge Hayot emailed Plaintiff stating that the agency had not yet designated a representative but that steps were being taken to identify the proper contact. Despite the earlier Notice of Intent to Issue Sanctions on May 2, no adjudicatory orders were issued to guide discovery, clarify record development, or define party participation. No venue transfer order was entered, despite Plaintiff's out-of-state location, and no scheduling directive or procedural framework was established to govern the hearing. (See Exhibit D-2; Exhibit D-3)

44. On June 5, 2025, Judge Hayot acknowledged that the agency still had not designated a representative. Rather than exercising adjudicatory control, she continued to defer to the agency's nonparticipation, despite having full jurisdiction over the case. Plaintiff formally

12

placed the judge on notice that her outreach to the agency constituted ex parte communication and underscored that her role was not to wait for voluntary agency engagement, but to adjudicate a pending civil rights matter as 29 C.F.R. § 1614.109(a), EEO MD-110, Chapter 7, AJ Handbook, Ch. 1(B)–(D) requires. (See Exhibit D-4)

45. In the same June 5 communication, Judge Hayot acknowledged that any dismissal must follow a formal process and provide the complainant an opportunity to respond on jurisdiction. Nonetheless, she suggested Plaintiff consider withdrawing his hearing request based on his disclosed medical condition. At a moment when the agency was in procedural default, and the record stood ready for review, the Commission offered not adjudication, but exit—on grounds unrelated to law or fact.

46. On June 10, 2025, Plaintiff Received a Notice of Intent to Dismiss on jurisdictional grounds.

47. On June 23, 2025, the agency submitted a filing to the EEOC Public Portal, despite the absence of a designated agency representative and without any adjudicatory order authorizing or governing such participation. The only two orders issued during the hearing phase were a Notice of Intent to Dismiss and the final Dismissal Order. Neither reflected the exercise of procedural control, and no adjudicatory engagement occurred between the time of judicial assignment and case termination.(See Exhibit 1)

48. On June 25, 2025, Plaintiff's complaint was dismissed for failure to state a claim, following a prior Notice of Intent to Dismiss based on lack of jurisdiction. Plaintiff was not given an opportunity to respond before the case was closed, and the dismissal order did not address the suppression of documents through the EEOC Public Portal. The case was never certified.

13

49.     Taken together, these facts confirm that the EEOC never exercised adjudicatory authority over the proceeding. The agency was not investigated, was not sanctioned, and was not required to file a single document. Yet Plaintiff was expected to construct the record alone, submit compliant pleadings, preserve suppressed filings, and maintain procedural discipline in the absence of any from the Commission. At every juncture where adjudication was required, the Commission chose inertia. And at the point where Plaintiff had done everything the system demanded and more, the case was dismissed without response, without record certification, and without law. A process that punishes participation and rewards default is not adjudication. It is containment.

### E. Development, Control, and Integrity of the Hearing Record
*(29 C.F.R. §§ 1614.109(b)–(f); MD-110, Ch. 6) 5 U.S.C § 706)*

50.     During the hearing phase, Plaintiff submitted multiple motions, exhibits, and supporting filings through the EEOC Public Portal. The system confirmed successful upload and docketing with timestamps and document titles. However, several filings later became inaccessible, returning error messages upon access. Plaintiff preserved contemporaneous video evidence showing that documents with legal-descriptive filenames were suppressed after upload, while identical files renamed with neutral alphanumeric titles remained accessible. This confirmed that suppression was triggered by file titles, not content. (Exhibit 1)

51.     Plaintiff formally declined Alternative Dispute Resolution and requested a hearing. Although the agency acknowledged the declination, the case was nonetheless placed in "Referred to ADR" status within the EEOC Public Portal, where it remained for forty-seven days. No mediation was offered, no scheduling occurred, and no communications were issued. Plaintiff received no ADR services of any kind.

14

52. The EEOC further stated that case processing proceeds "regardless of whether it is technically in ADR," and that requests to exit ADR are extremely rare. No timeline, enforcement mechanism, or adjudicatory control applied during this period.

53. Plaintiff's case was assigned to the Washington Field Office, which is outside Plaintiff's venue and, according to the EEOC Office of Inspector General Report, 2020, is the most backlogged office in the nation, with average case durations exceeding 600 days.

54. On June 23, 2025, Plaintiff notified Supervisory Judge Hayot twice and submitted a mass escalation email to the EEOC Chair, the Director of the Office of Federal Operations, the Office of Inspector General, the Office of Legal Counsel, the Amicus Division, the Office of Legislative Affairs, and two congressional staffers. The escalation documented keyword-based record suppression, portal manipulation, and procedural inaction, and included over 30 minutes of screen-recorded evidence and 18 suppressed filings through a Google Drive link. (Exhibit E-1)

55. On June 24, 2025, Plaintiff sent three additional emails to Supervisory Administrative Judge Hayot, reiterating that the EEOC Public Portal had suppressed filings based on keyword-sensitive document titles. Plaintiff re-submitted all 18 affected documents and formally requested that they be uploaded into the official record. These filings included emergency motions, dispositive pleadings, and the Response to the Notice of Intent to Dismiss. No acknowledgment or corrective action was issued. (See Exhibit E-1)

56. As a result, the hearing proceeded on a docket that appeared complete but was substantively inaccessible, structurally unstable, and procedurally undefined. No order was issued certifying the record, and the Administrative Judge did not verify or stabilize the docket before dismissal. These omissions violated nondiscretionary duties under 29 C.F.R. § 1614.109(f) and MD-110, Ch. 6. Under 5 U.S.C. §§ 706(1) and 706(2)(D), agency action must be set aside where

15

it is taken without observance of procedures required by law or where the agency unlawfully withholds action. Because no certified record was ever created or preserved, the dismissal lacked a lawful evidentiary basis and cannot stand, and the surrounding record irregularities raise serious concerns of spoliation and denial of meaningful adjudication.

57. The continuation of this process no longer reflects passive oversight but an active design. What began as procedural formality evolved into a system structured to displace accountability. When dismissal was not immediate and the complainant was not exhausted, the agency shifted from non-response to quiet resistance. At every stage, Plaintiff remained the only participant constructing, preserving, and maintaining the record. The agency issued no discovery, filed nothing, certified nothing, and refused to define what constituted the official case record. As institutional mechanisms failed, Plaintiff documented each breakdown to preserve the evidentiary path forward. But as it became clear that adjudication would not occur, Plaintiff recognized that the record itself had become the threat. Each filing and preservation effort risked being repurposed, mischaracterized, or used to undermine credibility for the mere act of persistence. What emerged was not a neutral failure but a procedural framework perfected to suppress filings and prevent accountability. In such a structure, justice is not denied at the end, it is prevented from beginning.

**F. Disability Disclosure and Request for Reasonable Accommodation in the Hearing Process** *(29 C.F.R. § 1614.203(d); Section 504 of the Rehab. Act, 29 U.S.C. § 794)*

58. Plaintiff is a qualified individual with a documented disability that affects his ability to manage unstructured administrative procedures, maintain sustained concentration, and meet procedural deadlines without support. These limitations may require extended response windows or communication adjustments in the event of health-related barriers. On May 23, 2025, Plaintiff submitted a formal written request for reasonable accommodation to the assigned Administrative

16

Judge, identifying specific barriers and requesting adjustments including timely assignment of a judge, clear communication of deadlines, and structured or remote hearing options.

59. This request triggered the EEOC's nondiscretionary duty to initiate the interactive process pursuant to 29 C.F.R. § 1614.203(d). The agency neither responded nor engaged in any interactive dialogue. The request was later quoted in the Dismissal Order, but no accommodation was granted and no procedural adjustments were implemented.

60. Between August and September 2025, Plaintiff submitted at least fifteen additional accommodation requests to the Office of Federal Operations, the Office of Legal Counsel, the FOIA Office, the Office of the Inspector General, and the Office for Civil Rights. Despite statutory triggers and regulatory deadlines, no component acknowledged the requests, initiated an interactive process, or provided any accommodations. OCR acknowledged receipt but took no further action.

61. The consistent refusal of every EEOC division to act on Plaintiff's documented accommodation requests supports a strong circumstantial inference that the agency does not meaningfully process disability-related accommodations within its adjudicatory system. Despite formal notice and governing obligations, no division initiated the required process or made any procedural adjustments. This uniform failure reflects not isolated neglect but structural denial of access. As a result, Plaintiff was unable to obtain any accommodation from any part of the EEOC.

### G. Jurisdictional Communications and Notice of Intent to Dismiss
*(29 C.F.R. §§ 1614.107, 1614.109; 5 U.S.C § 706)*

62. On May 22, 2025, the EEOC informed Plaintiff that no Administrative Judge had been assigned to his April 16 hearing request and that assignment was expected the following month.

17

63. On June 2, 2025, Supervisory Administrative Judge Danielle Hayot was assigned. The agency still had not submitted the complaint file or Report of Investigation as required under 29 C.F.R. § 1614.108(h), despite an earlier Notice of Intent to Sanction issued on May 2. No sanctions followed and the file remained unproduced.

64. On June 10, 2025, Judge Hayot issued a Notice of Intent to Dismiss, asserting that dismissal "may be appropriate" for lack of jurisdiction. The notice misstated the response deadline as June 24, 2024, barred all submissions except a specific response, and lacked a certificate of service. It did not acknowledge the missing record, suppressed filings, or pending accommodation requests. (See Exhibit G-1)

65. Plaintiff submitted a timely response on June 12, which Judge Hayot acknowledged by email. The response and related filings became inaccessible in the portal. On June 23, Plaintiff submitted a supplemental response documenting the suppression. That same day, the agency filed for the first time, despite not having a designated representative or a certified record.

66. The dismissal process proceeded on an incomplete and unstable record, with misdated deadlines, suppressed filings, and delayed agency participation. No corrective action was taken. Under 5 U.S.C. § 706(2)(D), agency action taken without observance of required procedures must be set aside.

67. The convergence of record omissions, notice defects, and asymmetric participation supports a circumstantial inference that the dismissal was not the result of neutral adjudication but a structurally compromised process that excluded the complainant while retroactively admitting the agency. Under these conditions, the dismissal lacks procedural legitimacy.

**H. Issuance of the Dismissal Order and Disposition of Pending Motions**
*(29 C.F.R. § 1614.109(i); 5 U.S.C. §§ 555(b), 706(1), 706(2)(D))*

18

68. On June 25, 2025, Supervisory Administrative Judge Danielle J. Hayot issued an Order of Dismissal terminating Plaintiff's hearing request. The order cited 29 C.F.R. §§ 1614.107(a)(1) and 1614.109(b), claiming to follow the June 10 Notice of Intent to Dismiss and a review of the parties' responses.

69. Although Plaintiff submitted a detailed hearing request on April 16, 2025, including a cover letter, claims summary, legal theory, and supporting exhibits, the order treated an unrelated October 25, 2024 agency letter as the operative hearing request. That letter contained no claims or request from Plaintiff. The judge relied on this mischaracterization to dismiss the case, disregarding Plaintiff's actual submissions.

70. The order also stated that the agency filed a response on June 6, 2025, though portal records show no agency activity until June 23. It cited a "VA Form 4949" that does not appear in the VA's official form directory and was not included in the record. The order referenced Plaintiff's May 23 accommodation request but failed to indicate whether it was granted or reviewed.

71. The stated basis for dismissal was "failure to state a claim," a new ground not raised in the NOID, which was based on "lack of jurisdiction." This sua sponte shift deprived Plaintiff of the opportunity to respond. No hearing occurred, no findings were issued, and no pre-hearing procedures were followed. The record was never certified, and eighteen key filings, including Plaintiff's response to the NOID, had been flagged as suppressed days earlier.

72. The order further directed Plaintiff to await a 40-day agency final action before appealing, contradicting 29 C.F.R. § 1614.110(a), which permits immediate appeal when the agency fails to act. The order lacked a certificate of service.

19

73. The Order of Dismissal cited Plaintiff's May 23, 2025 reasonable accommodation request in full but issued no ruling, offered no response, and took no procedural action. Under 29 C.F.R. § 1614.203(d) and Management Directive 110, the EEOC was required to initiate the interactive process and respond within five business days. The failure to address the request violated this nondiscretionary duty and further undermined the dismissal's procedural validity. The Order also publicly disclosed Plaintiff's medical conditions, information protected under MD-110, Ch. 12, which prohibits the inclusion of disability-related disclosures in adjudicatory documents unless required for legal analysis. No such analysis occurred. Citing the request without engagement supports an inference that it served a rhetorical, not adjudicatory, purpose. This omission reinforces both the denial-of-access theory and the ultra vires claim, as the dismissal proceeded despite unresolved statutory obligations. (See Exhibit H-1)

74. These facts show the dismissal was procedurally invalid, unsupported by the record, and issued without legal authority. The judge disregarded Plaintiff's filings, invented a procedural basis, cited nonexistent documents, and failed to correct known access barriers. The resulting order cannot stand under EEOC regulations or the Administrative Procedure Act.

75. At this point, the continuation of this process confirms that no component of the EEOC activated its procedural obligations, even after formal disclosure of disability. Across intake, investigation, adjudication, record preservation, and accommodation, the burden remained entirely on Plaintiff to identify defects, preserve the record, and request compliance. Plaintiff submitted multiple targeted accommodation requests tied to functional barriers created by the agency's own systems, yet the EEOC never engaged the interactive process or issued a procedural adjustment. What followed was not delay, but escalation. After refusing to investigate, certify the docket, or adjudicate, the Commission issued a dismissal order that used the record against the

20

complainant, citing Plaintiff's confidential accommodation request in full and attaching sensitive medical disclosures unrelated to any legal disposition. These materials served no adjudicatory purpose. They served a chilling one. By embedding private disclosures in a procedurally void order, the Commission signaled that continued pursuit, by appeal or by filing in federal court, would carry personal cost. The dismissal did not resolve the case. It marked the point at which exclusion became deterrence.

### I. Appeal to the Office of Federal Operations
*(29 C.F.R. §§ 1614.401–1614.405)(Rule 37(e))*

76. On July 15, 2025, Plaintiff timely appealed the June 25 Dismissal Order to the EEOC's Office of Federal Operations (OFO). The appeal was docketed as No. 2025003568, and OFO acknowledged receipt on July 22. (See Exhibit I-5; Exhibit I-6)

77. Under 29 C.F.R. § 1614.403, the agency was required to submit the complete complaint file and Report of Investigation. It did not. In its September 2, 2025 appeal response, the agency reiterated a position first raised on June 23 during the hearing phase: that Plaintiff's claims fell outside EEOC jurisdiction and did not warrant an ROI. However, this defense was never resolved in the dismissal order, and the agency's refusal to comply with file production requirements remained a procedural violation.

78. Plaintiff moved to strike the agency's filing as untimely, procedurally defective, and legally barred. The filing was eleven days late, misaddressed, and lacked a certificate of service. Plaintiff also cited *Fort Bend County v. Davis*, 139 S. Ct. 1843 (2019), where the Supreme Court held that Title VII's charge-filing requirements are non-jurisdictional and subject to forfeiture if not raised in a timely manner. Plaintiff argued that the agency forfeited its defense by failing to raise jurisdiction at complaint intake or move to dismiss within the 30-day window prescribed by 29 C.F.R. § 1614.107

21

79. On September 26, OFO's system status changed from "Appeal Received" to "Complaint File Not Received." Around December 16, it changed again to "Complaint File Received," though no certified ROI or complaint file was ever served on Plaintiff as required by regulation. (See Exhibit 2)

80. During the appeal, Plaintiff notified the EEOC's Office of Federal Operations that key filings, including a reasonable accommodation request and an emergency motion submitted on August 14, 2025, were suppressed from the portal record. Plaintiff escalated these issues via email on August 29, September 3, and September 5. OFO took no public action but silently re-uploaded the documents to the portal on September 11 and September 17. No explanation, ruling, or correction was issued, and the procedural impact of the suppression remained unaddressed.

81. These events reflect more than a procedurally flawed appeal; they reveal a pattern of coordinated timeline manipulation and record suppression designed to simulate adjudication while evading regulatory accountability. The EEOC altered Plaintiff's appeal date based on an unauthorized external inquiry, used the revision to retroactively validate a late agency filing, and silently corrected suppressed documents without acknowledgment. At every stage, process was preserved in form but denied in function. The record supports a strong inference that the appeal was procedurally null and structurally incapable of delivering lawful review.

### J. Internal Oversight as Containment: Record Access Failures and Structural Obstruction *(5 U.S.C. §§ 704, 706(1))*

82. Between June and October 2025, Plaintiff engaged nearly every internal oversight office within the EEOC to report procedural failures, record suppression, and denial of adjudicatory access. These included the Office of Federal Operations (OFO), Office of Legal Counsel (OLC), Freedom of Information Act (FOIA) Office, Office of Inspector General (OIG), and Office for Civil Rights (OCR). Plaintiff submitted metadata evidence, video documentation,

22

regulatory citations, and preservation demands. Despite escalating to officials with clear authority, including the Chief Administrative Judge and a sitting EEOC Commissioner, EEOC Director, no office initiated an investigation, reconstructed the record, or acknowledged the procedural breakdowns.

83. Each division followed the same pattern: initial receipt, partial acknowledgment, then abandonment. The FOIA office denied Plaintiff access to his own adjudicatory records while remanding requests without preserving them. OLC ignored formal legal notices. OCR demanded specificity in Plaintiff's Section 504 complaint, then declined to investigate once that specificity was provided. OIG disclaimed jurisdiction over "programmatic issues" while simultaneously asserting responsibility for "fraud, waste, and abuse." The Chief Administrative Judge dismissed documented venue violations by citing an unrelated 2020 case and disregarding applicable regulations.

84. These events demonstrate that Plaintiff exhausted all internal remedies. His claims were not dismissed for lack of diligence but absorbed by a system designed to simulate accountability while preventing it. Under 5 U.S.C. § 704, exhaustion is satisfied. Under 5 U.S.C. § 706(1), the EEOC failed to perform nondiscretionary duties. This was not mere oversight. It was administrative containment, a closed system that preserved the appearance of access while extinguishing its substance.

**K. Privacy Act:** Procedural Containment Through External Channels
*(5 U.S.C. § 552a(b), (e)(10))*

### K.1. leak of dismissal order

85. On September 5, 2025, Plaintiff was actively submitting a formal Section 504 complaint to Acting Director Conor Ahern at the EEOC Office for Civil Rights.

23

86. By 2:13 PM, Plaintiff had sent over 25 documents and a Google Drive link containing 40 minutes of portal suppression video and 15 additional exhibits, including the June 25 Dismissal Order.

87. At 2:34:32 PM, Supervisory Administrative Judge Danielle Hayot emailed the Dismissal Order and enclosures to Conor.Ahern@leschtlaw.com, an external email address. (See Exhibit K-1)

88. The transmitted file included Plaintiff's disability-related accommodation requests and medical diagnoses.

89. Metadata analysis confirms the file was last modified at 2:40:51 PM, consistent with automated sanitation protocols triggered by internal systems prior to user access. (See Exhibit K-2)

90. Between 2:40:51 p.m. and 2:43:59 p.m. A span of three (3) minutes and eight (8) seconds, Alan Lescht opened the 28-page document, located Plaintiff's email on page nine, read and comprehended at least part of the dismissal order, composed a new message, and sent a solicitation email to Plaintiff. (See Exhibit K-1)

91. At 2:43:59 PM, Alan Lescht emailed Plaintiff directly, stating that his firm had received the decision and inviting Plaintiff to consult with the firm for representation, including a reference to available compensation terms. (See Exhibit K-1)

92. The three-minute and eight-second window between file access and email delivery confirms that the file was opened, read, processed, and used to solicit Plaintiff almost immediately after transmission.

93. At 4:23 p.m., Plaintiff notified Conor Ahern that Judge Hayot had disclosed the Dismissal Order to a private law firm, which had already contacted Plaintiff to solicit

24

representation. This unsolicited outreach, based on misdirected agency records, violated basic legal ethics under ABA Model Rule 4.4(b), which prohibits attorneys from using inadvertently received documents for personal or professional advantage. (See Exhibit K-3.)

94. In his 4:47 p.m., response, Ahern stated that he had "requested the decision from AJ Hayot to begin gathering information to supplement [his] understanding of [Plaintiff's] claims and experiences with the EEOC in order to inform [his] formulation of [Plaintiff's] claims for acceptance."

95. Ahern did not explain why he required the decision from Judge Hayot when Plaintiff had already provided it, along with supporting documentation and video evidence, earlier that same day.

96. Ahern wrote: "It appears that Hayot emailed it to my former email address at my prior law firm," confirming that the transmission occurred through an external domain unrelated to his current EEOC role and previous relationship.

97. This admission raises multiple concerns: that Hayot either relied on an outdated contact without verification, or Ahern supplied it himself; that Hayot did not simply "reply" to an email thread from Ahern, suggesting non-email communication occurred; and that Ahern failed to disclose the nature of his prior relationship with Hayot.

98. If the request was made by phone, it raises the possibility of back-channel communication during an active, unresolved complaint investigation.

99. Ahern's message did not acknowledge the privacy implications of the breach, invoke any formal breach-handling protocol, or indicate that IT, legal, or compliance units had been notified.

25

100. Instead, Ahern stated only: "I will ask Judge Hayot to recall the message, and trust that Alan Lescht will do so." Without any correction, Plaintiff was expected to trust a private third party to self-correct a government privacy breach, a party who had already acted on the leaked information and was now being relied upon not to act further.

101. No confirmation of recall was provided, and no evidence was offered that the disclosed records were withdrawn, contained, or flagged for breach documentation.

102. Research into Alan Lescht & Associates revealed that the firm employs a former EEOC Administrative Judge who served during the timeframe relevant to Plaintiff's case and previously worked in the Office of Federal Operations drafting appellate decisions and training other judges. The firm is known for federal-sector EEO litigation and regularly appears before EEOC Administrative Judges and the Office of Federal Operations.

103. Although the firm consists of approximately fifteen attorneys, it regularly appears before EEOC Administrative Judges and the Office of Federal Operations and is widely recognized for its specialization in federal-sector EEO complaints.

104. This overlap between agency personnel and private counsel, coupled with the firm's high frequency of appearances before the EEOC, raises structural concerns about institutional proximity, informal influence, and the risk of aligned interests within what is expected to be an adversarial process.

105. Taken together, most reasonable inference from this sequence is that the disclosure to Alan Lescht & Associates was not accidental, but served a strategic function. At the time of the leak, Plaintiff was actively submitting evidence of procedural suppression and disability-related access failures. Instead of addressing those claims through formal review, an EEOC official routed Plaintiff's adjudicatory records to a law firm with established institutional ties and a known

26

litigation history against federal agencies. That firm contacted Plaintiff within minutes, referencing compensation, creating an opportunity to shift the complaint into a private legal channel. Had Plaintiff accepted, the matter could have been redirected toward settlement, neutralization, or strategic closure, allowing the agency to avoid deeper scrutiny and preventing district court review. The timing, the personnel overlap, and the absence of any safeguards, support a circumstantial inference of deliberate institutional containment.

### K.2. Privacy Release Form verification failure through unauthorized congressional inquiry

106. On August 29, 2025, 2:30 p.m., Cammie Britton submitted an unauthorized Congressional inquiry reusing an expired privacy release form that was allocated to the hearings request during that same time that Plaintiff was submitting nine modular FOIA request from 1:30 p.m to 2:40 p.m. The contemporaneous evidence indicates not random but rushed to counter Plaintiff's FOIA request. Circumstantial evidence indicates a deliberate attempt to place a false appeal date on the record. Rule 37(e). (See Exhibit I-1; Exhibit I-2)

107. On September 17, 2025, Natalie Fritz-Meyers, Director of Legislative Affairs, submitted a formal response to Congress falsely stating that Plaintiff's appeal was filed on August 19. This contradicted the EEOC public portal's own records, which reflected Plaintiff's actual submission on July 15. Fritz-Meyers did not verify the expired Privacy Release Form used in the inquiry and failed to confirm the appeal date through portal logs or official filings. Her unverified response was treated as dispositive, allowing the VA to enter the record without penalty while Plaintiff was procedurally repositioned as untimely. This manufactured timeline shift concealed agency default and created the appearance of compliance where none existed. (See Exhibit I-3)

27

108. The continuation of this process did not merely reflect internal failure. It demonstrated how external actors, and unauthorized disclosures reinforced a system already collapsing from within. Plaintiff's adjudicatory records were transmitted to private counsel without authorization, acted on within minutes, and never retrieved, reported, or contained. The EEOC offered no explanation rooted in law, no breach protocol, and no institutional accountability. At the same time, a congressional staffer submitted an unsolicited inquiry that triggered an internal appeal date revision, which was later affirmed in a formal letter to Congress. These events did not occur in isolation, but they operated in coordination. What emerges is not a closed proceeding, but a closed system where internal exhaustion and external diversion converge to extinguish the forum entirely.

## L. Absence of Any Corrective or Remedial Action & Circular Containment (5 U.S.C. §§ 555(b), 706(1), 706(2)(D))

### L.1. Absence of Any Corrective or Remedial Action

109. At no point did the EEOC reconstruct the administrative record, certify the completeness of the hearing or appellate files, or issue any order defining or stabilizing the record for review.

110. No official assumed responsibility for coordinating corrective action across divisions, and the agency never provided a unified explanation of Plaintiff's procedural posture or the irregularities affecting his case.

111. Plaintiff was not given any opportunity to participate in a remedial process to address missing filings, inaccessible records, unresolved accommodation requests, or contradictory agency guidance. Instead, each attempt by Plaintiff to assert his rights was met with increased procedural exclusion.

28

112.    Rather than correct errors, the system intensified them. As Plaintiff escalated to internal authorities, oversight offices, and even congressional channels, the EEOC's response was to proceed toward dismissal and without stabilizing the record or addressing the known barriers. Each step toward asserting procedural rights resulted in deeper exclusion from the process.

113.    By the end of the hearing phase and throughout the ongoing appellate phase, the record remained uncertified, unresolved, and procedurally unstable. No corrective action had been taken. The EEOC continued adjudication on a fragmented and inaccessible record, while simultaneously barring Plaintiff from meaningful participation. This was not passive neglect but a response pattern consistent with procedural containment, in which every assertion of rights triggered greater institutional resistance.

### L.2. Circular Containment

114.    On June 19, 2025, Plaintiff asked Chief Judge Regina Stevens why his North Carolina–based case was assigned to the Washington Field Office. Stevens denied any reassignment, cited no rule, and gave no explanation, confirming there was no process to challenge improper venue.

115.    In the same oversight thread where Plaintiff asked Chief Judge Regina Stevens to explain his venue assignment, the Office of Federal Operations responded by instructing him to direct further inquiries to EEOC.HEARINGS@eeoc.gov, the very office Stevens leads, and the same one Plaintiff was already addressing. Rather than offer clarity or intervention, OFO provided guidance so redundant that silence would have been more honest. (See Exhibit L–1)

116.    On August 21, 2025, Plaintiff received a response from the EEOC Office of Inspector General to a formal complaint alleging record tampering, procedural suppression, and jurisdictional manipulation. The OIG recharacterized the complaint as a discrimination matter and

declined review. In the next paragraph, it cited the Inspector General Act of 1978 as the basis for investigating fraud, waste, and abuse in EEOC programs. The contradiction required no interpretation. It stood on the page, one sentence after another. (See Exhibit L–2)

117. Between September 5 and 17, 2025, Plaintiff submitted a structured Section 504 complaint to the EEOC Office for Civil Rights, supported by legal citations, factual allegations, and defined access-denial periods. OCR initially rejected the complaint as too broad and requested specifics. Plaintiff complied by identifying the governing regulations and placing each claim within a duty-breach-causation structure. When OCR again demanded further clarification, Plaintiff resubmitted the complaint using the McDonnell Douglas framework. OCR then reversed course, stating that Plaintiff did not understand the process and should present the complaint more broadly. (See Exhibit L–3)

118. To reduce burden, Plaintiff submitted nine FOIA requests between August 29 and September 9, 2025, each titled and filed for modular processing. The EEOC aggregated them into a single "complex" matter, then denied expedited processing on the grounds of burden. The agency created the complexity, then used it to justify denial. (See Exhibit L–4)

119. On August 29, 2025, during a critical appeal window, a congressional staffer submitted an unsolicited inquiry to the EEOC referencing Plaintiff's appeal. It included no facts, no constituent questions, and relied on an expired privacy release. By September 17th, the EEOC revised Plaintiff's appeal date from July 15 to August 19. The inquiry did not clarify, resolve, or advance the claim. It functioned as a procedural signal, and the agency used it to alter the record. Procedurally barring him due to untimely filing. This was not oversight. It was reinforcement. (See Exhibit L–5)

30

120.    On January 7, 2026, the EEOC Office for Civil Rights assigned a contract investigator, Kenna M. Ashley, to Plaintiff's pending Section 504 complaint. In written correspondence, Ashley stated that she was "the finder of fact" for the investigation, but that she did not make determinations regarding whether a violation of law had occurred. She further stated that the claims to be investigated had already been defined, that Plaintiff would be required to complete a written statement addressing those claims, and that she would not share the documents or materials she had been provided. Ashley advised that while Plaintiff could suggest documents or witnesses, the investigative record itself would not be disclosed or made available for review. The investigation therefore proceeded on an undisclosed record, framed prior to Plaintiff's participation, with no mechanism for Plaintiff to review or verify the evidence to be considered. (See Exhibit L–6.)

121.    The investigator assigned to Plaintiff's Section 504 complaint was not a federal employee, but a private contractor. Despite lacking adjudicatory authority, she asserted control over factual development, confirmed that the scope of the claims had been pre-defined, and denied Plaintiff access to the materials used to frame the investigation. Through this delegation, the EEOC transferred control of the investigatory record to a third party while retaining the ability to rely on that record, without permitting Plaintiff to review, contest, or verify its contents. No internal EEOC office assumed responsibility for record disclosure, certification, or corrective review during this process.

122.    These events do not reflect oversight or error. They follow a pattern: offer process, reverse course, shift blame, deny relief. Each office presented a path, then rerouted it to the source of the harm. Oversight bodies referred Plaintiff to the very officials under challenge. Procedural rules were used not to ensure access, but to block it. What emerged was not inertia, but a system

31

designed to function without correction. This is what forty years under *Chevron* created, an architecture of unchecked discretion, where even the EEOC's own OIG and the 2024 GAO report identified systemic breakdowns with no internal path to remedy. Plaintiff did not expose this by force. He revealed it by being the only person who followed the rules. If a citizen complies at every turn and the system still collapses around him, then what remains of process at all. (See Exhibit L–1)

123.     The continuation of this process confirms that the administrative system did not fail by accident. It failed behind layers of immunity, under the cover of discretion, and through silence perfected by time. When the record can be altered, suppressed, or rerouted without consequence, and when a complainant takes every step to preserve it, adjudication becomes a permissioned process, not a protected one. Rather than correct the record, the agency replicated it, diluted it, concealed it. And when that manipulation is met not with correction but indifference, the right to petition is no longer protected. It was erasure.

## M. Institutional Roles and Key Decision-Makers Contributing to Procedural Breakdown

### M.1. Cammie Britton - Caseworker II

124.     After Plaintiff's June 2 escalation to the EEOC, Cammie Britton was assigned as his congressional caseworker. She introduced herself but ceased all meaningful communication after shortly after assignment. Plaintiff sent over twenty emails documenting record suppression and oversight failures. Britton did not respond to any of them.

125.     On June 5, Britton submitted a congressional inquiry to the EEOC Office of Legislative Affairs, referencing Plaintiff's case and requesting status. She forwarded the EEOC's

32

confirmation of receipt to Plaintiff the same day. The EEOC responded on June 13, but Britton withheld the response until June 23, after Plaintiff directly contacted her by phone.

126. From June 5 through September 9, Plaintiff sent over twenty emails to Britton, documenting portal suppression, FOIA interference, judicial silence, and adjudicatory exclusion. These included filings to Judge Hayot, OFO, EEOC OIG, and congressional oversight. Britton did not respond to any of them.

127. On June 23, when Plaintiff called Britton to report active suppression of filings, she redirected the call and insisted he read the June 13, EEOC response. The document quoted language from the June 10, Notice of Intent to Dismiss, which Plaintiff had already received and responded to. When Plaintiff noted procedural defects in the dismissal notice and asked what the agency would likely do next, Britton replied, "Well... it looks like they will," referring to dismissal. She offered no assistance, issued no follow-up, and did not raise any inquiry with the agency on Plaintiff's behalf.

128. The August 29, 2025 inquiry did not function as constituent advocacy. It was submitted without notice, during the same 70-minute window in which Plaintiff filed nine FOIA requests and escalated record-access violations. The inquiry referenced Plaintiff's EEOC hearings process, which had been closed for over two months, and did not include a single question or request for clarification. It began by stating, "Please find attached Privacy Release Form completed by our constituent," and continued with the only substantive content: "As I understand, Mr. Eberst filed an appeal with the EEOC Office of Federal Operations." The attached privacy form was dated June 2 and applied only to the earlier hearings request. Britton had not responded to any communication from Plaintiff in over 85 days, did not notify him before or after submission, and only acknowledged the action following Plaintiff's escalation. No follow-up occurred.

33

129. What resulted from the congressional inquiry was that the agency entered the record the next business day on September 2, at 8:36 p.m.; FOIA request denied on September 9; appeal submission date changed from July 15 to August 19.

130. On September 9, following Plaintiff's escalation, Britton issued a written apology acknowledging the August 29 inquiry was submitted "on your behalf" without notification or coordination. The original inquiry was later provided to Plaintiff by a different staffer.

131. These facts, taken together, support a clear inference. The inquiry was not based on a pending issue, not framed around the active phase of Plaintiff's case, and not submitted with the knowledge or input of the constituent it purported to represent. It included no open-ended questions, no advocacy language, and no attempt to solicit information. It introduced a new procedural timestamp at the precise moment Plaintiff was escalating FOIA activity and exposing record suppression. Viewed in context, the inquiry was not a request. It was a procedural intervention that signaled a new anchor date for the agency to structure its response timeline. This was not constituent service. It was an external contribution to internal containment.

### M.2. Natalie Fritz-Meyers - Director, Legislative Affairs - Office of Communications and Legislative Affairs

132. On September 17, 2025, Natalie Fritz-Meyers issued a formal response to a congressional inquiry stating that Plaintiff's appeal had been received on August 19. That date appears nowhere in the agency's public-facing portal, logs, or user-accessible records, and contradicts Plaintiff's documented and acknowledged July 15 appeal.

133. Fritz-Meyers did not explain the source of the August 19 date. She cited no portal logs, did not reference Plaintiff's filings, and made no mention of suppressed records, restored documents, or pending FOIA activity. Her response mirrored a vague, unverified statement

34

submitted by Cammie Britton, which reused an expired privacy release and contained no constituent input. Despite these defects, Fritz-Meyers treated the inquiry as dispositive.

134. The EEOC adopted August 19 as the official appeal date. On September 2, the VA entered the record, the next business day after Britton's submission and exactly 14 days after the substituted date. This was not a clerical error. It repositioned Plaintiff's appeal as untimely, masking agency default while undermining the integrity of Plaintiff's appeal. The sequence was not speculative. Britton's inquiry served as a procedural signal, and Fritz-Meyers institutionalized it without verification, enabling a retroactive alteration that concealed procedural misconduct.

### M.3. Lynn Dickinson - Senior Attorney Office of Legal Counsel (OLC) Publicly named in the Federal Register and Kimberly Essary - Associate Legal Counsel

135. Lynn Dickinson, Senior Attorney in the EEOC's Office of Legal Counsel, was publicly named in the Federal Register on January 10, 2025, as a designated contact for regulatory and recordkeeping matters. Her position carries delegated authority over procedural compliance and legal oversight of agency records.

136. On September 18, 2025, Dickinson was assigned as the reviewing legal custodian for Plaintiff's FOIA Appeal No. 820-2025-000853A. The agency's acknowledgment letter emphasized her assignment by bolding her name and phone number.

137. On September 26, Plaintiff placed Dickinson on formal notice that the agency's adjudicatory record included a false appeal date, and that system metadata and portal logs confirmed suppression and misrouting. The notice cited statutory preservation duties and criminal provisions under 18 U.S.C. §§ 4 and 1519, and requested confirmation that all responsive records and metadata would be preserved and reviewed. Dickinson was legally obligated to acknowledge the dispute, initiate corrective review, or refer the matter for supervisory action.